UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOANNE OPDAHL, et al., | CASE NO. C23-5329 BHS |
| Plaintiff, | ORDER |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

This matter is before the Court on the government's motion for summary judgment, Dkt. 38, and motion to exclude testimony of plaintiffs' experts, Dkt. 43. This case concerns plaintiffs Joanne Opdahl and Hannah Saib's tort claims against the government for injuries they suffered when a tree fell onto their car as they drove through Mount Rainier National Park on State Route (SR) 123.

Because the discretionary function exception to the Federal Tort Claims Act (FTCA) shields the government from tort liability in this case, the government's motion for summary judgment, Dkt. 38, is granted.

ORDER - 1

## I. BACKGROUND

The National Park Service manages Mount Rainier National Park. The Service "strive[s] to understand, maintain, restore, and protect the inherent integrity of the natural resources, processes, systems, and values of parks while providing meaningful and appropriate opportunities to enjoy them." Dkt. 40-1 at 6. While visitor safety is a significant goal, the Service may undertake such "discretionary management activities . . . only to the extent that they will not impair park resources and values." *Id.* at 7. The policies direct the Service to "reduce or remove known hazards" through "actions . . . that have the least impact on park resources and values." *Id.*

A regional policy directs parks in the Pacific West Region, including Mount Rainier National Park, to administer hazard tree management programs to reduce "the risk of injuries, fatalities and property damage due to tree failures in developed areas." Dkt. 40-2 at 3. Park superintendents "retain discretion to administer" these programs "with available park staff and financial resources in the context of other legal requirements and other considerations." *Id.* at 6. The policy outlines several surveys that parks should implement on a periodic basis: (1) drive-by surveys, (2) monitor surveys, and (3) complete surveys. *Id.* at 8. It defines drive-by surveys as "deliberate visual scans at slow vehicle speed" and "follow-up inspection of all trees . . . noted or suspected of possessing hazard characteristics." *Id.* Monitor surveys involve "a walk-through" and "visual scan for any highly defective trees," followed by a complete evaluation and rating of "trees initially perceived to be highly defective." *Id.* Complete surveys entail a thorough inspection of "each apparently defective tree." *Id.*

1       Mount Rainier National Park's Hazard Tree Management Plan aims to "maximize
2  the benefit/cost ratio of the hazard tree program, both in terms of property damage
3  prevented and money expended for inspection and implementation" and "maintain a
4  balance between mitigating hazardous trees, ecosystem preservation, and cultural
5  landscape preservation." Dkt. 40-3 at 8. The Plan requires periodic hazard tree
6  inspections by evaluators who are "familiar with signs and symptoms of diseases that
7  cause defects," "able to recognize anatomical features associated with failures," and
8  "aware of local weather and environmental conditions that may contribute to tree
9  failures." *Id.* at 10.

10      The Plan specifies that except for "formal pullouts established for roadside visitor
11 attractions," roads will "never receive complete surveys" due to "extensive personnel and
12 time requirements and the low potential for striking a target." *Id.* at 13, 15. Along "high-
13 use roads" such as SR 123, the Plan prescribes "annual drive-by monitoring surveys" and
14 photo-documentation every three years "to determine which segments have highly
15 defective trees." *Id.* at 13. The Service then performs individual tree evaluations on a
16 case-by-case basis "in response to observations of defective trees during drive-by
17 monitoring and reports from park staff, concessioners, and visitors." *Id.* Suspected
18 defective trees are ranked for failure potential on a scale of 2 to 8. *Id.* at 13, 15.

19      In contrast, because developed areas of the Park face a higher likelihood of "tree
20 failure causing serious injury to visitors," campgrounds and visitor use facilities will
21 receive annual monitor surveys and complete surveys every three to five years. *Id.* at 8,
22

32. Service employees are required to rate the hazard potential of each inspected tree that is perceived to be defective. *Id.* at 12.

From November 2019 to October 2020, the Service engaged the Washington State Department of Transportation (WSDOT) to conduct operational and emergency maintenance of SR 123, between milepost 2.5 and 16.5. Dkt. 50-1 at 1. Trained Service and WSDOT personnel were to jointly identify "[a]ll Hazard trees along the roads" and "assess the conditions of all hazard trees using" the Park's Hazard Tree Management Plan. *Id.* at 3. The work order specified that the Service was responsible for removing hazardous trees located more than eight feet off the road. *Id.* The Park's Supervisory Facility Operations Specialist reported that as far as he is aware, "WSDOT never reported to NPS any concerns

In July 2021, Opdahl and Saib were driving northbound through the Park on SR 123, near milepost 10, when a decaying tree (the "subject tree") fell onto their car. Dkt. 1. Opdahl and Saib were injured, and a third individual in the car, Sabina Saib,[1] was killed. *Id.* They sued the government for dangerous condition of public property and negligence. Dkts. 1, 22.

The government moves for summary judgment, asserting it is shielded from tort liability under the Federal Tort Claims Act's discretionary function exception. Dkt. 38 at 1. It argues the Park used its discretion to decide not to inspect and remove the subject tree based on various policy considerations. *Id.* at 8. Opdahl and Saib respond the

---

[1] The parties stipulated to dismissing plaintiff Sabina Saib's estate's claims. Dkt. 37. In this Order, "Saib" refers to plaintiff Hannah Saib.

ORDER - 4

discretionary function exception does not apply to Park Service's implementation of its hazard tree removal policies. Dkt. 49 at 7–8. They argue that the WSDOT work order imposed a mandatory duty to remove the subject tree. *Id.* at 4.

The government also seeks to exclude Opdahl and Saib's expert testimony on the grounds that the experts rely on likely incorrect factual assumptions. Dkt. 43.

## II. DISCUSSION

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52. The moving party bears the initial burden of showing that there is no evidence that supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails

to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

A.   **Discretionary Function Exception**

The FTCA waives sovereign immunity and permits tort claims against the government for the negligent or wrongful act or omission of an employee acting within the scope of his or her office or employment. 28 U.S.C. § 1346(b). This waiver of immunity does not apply when the government is performing a discretionary function. The discretionary function exception to the FTCA precludes governmental liability for any claim based upon the exercise or performance, or failure to exercise or perform, a discretionary function or duty, even if the discretion involved is abused. *See* 28 U.S.C. § 2680(a). It is the government's burden to establish that the discretionary function exception applies. *Young v. United States*, 769 F.3d 1047, 1052 (9th Cir. 2014).

The Court first looks to the allegations in the complaint to identify the "particular agency conduct with which Plaintiffs take issue." *Young*, 769 F.3d at 1053. "Determining the precise action the government took or failed to take (that is, how it is alleged to have been negligent) is a necessary predicate to determining whether the government had discretion to take that action." *Id.* at 1054.

The Supreme Court has established a two-part test for determining whether the discretionary function exception applies to the challenged government action. *Bibeau v. Pac. Nw. Research Found., Inc.*, 339 F.3d 942, 945 (9th Cir. 2003); *see also United States v. Gaubert*, 499 U.S. 315, 322–23 (1991); *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988). First, the challenged conduct must "be the product of judgment

or choice" on the part of the acting employee. *Id.* at 536. "[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for the employee to follow." *Id*. When an employee acts under such a mandatory directive, their conduct cannot be the product of judgment or choice because they have "no rightful option but to adhere to the directive." *Id*.

Second, that judgment or choice must be based on public policy considerations. *Id*. at 536–37. "The purpose of the [discretionary function] exception is 'to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *ARA Leisure Servs. v. United States*, 831 F.2d 193, 194 (9th Cir. 1987) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)). "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324. The applicability of the discretionary function exception depends "not on the agent's subjective intent in exercising [his discretion], but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* at 325.

The exception restores the government's immunity in situations where its employees are carrying out governmental or regulatory duties. *See Chadd v. United States,* 794 F.3d 1104, 1108 (9th Cir. 2015); *Blackburn v. United States*, 100 F.3d 1426, 1428 (9th Cir. 1996); *Faber v. United States*, 56 F.3d 1122, 1124 (9th Cir. 1995). Because the waiver of sovereign immunity is jurisdictional, the court lacks subject matter

jurisdiction over a claim that falls within the discretionary function exception. *See GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1173 (9th Cir. 2002). The exception applies regardless of whether the government agent was negligent in his duties, so long as his duties were discretionary. *Kennewick Irrigation District v. United States*, 880 F.2d 1018, 1029 (9th Cir. 1989).

Trees falling and injuring visitors on federally operated land is not a new phenomenon, unfortunately. Two recent Ninth Circuit cases illustrate how the discretionary function exception applies in such circumstances. The government cites to *Lam v. United States*, 979 F.3d 665, 670 (9th Cir. 2020), to argue that its Hazard Tree Management Plan allows Park employees significant discretion as to whether to inspect trees along SR 123. Dkt. 38 at 11–12. Opdahl and Saib refer to *Kim v. United States*, 940 F.3d 484, 486 (9th Cir. 2019), for the proposition that once the Park undertook to inspect the trees along SR 123, it was obligated to remove the subject tree under the Park's Hazard Tree Management Plan. Dkt. 49 at 8–10.

In *Kim*, a tree limb fell onto a tent in a Yosemite National Park campsite, killing two teenage boys. 940 F.3d at 486. The families sued, challenging the government's failure to identify and abate the danger, and provide warnings about the danger posed by the tree. *Id.* at 486–87. Yosemite officials had adopted a "Hazard Tree Management Program" that mandated using a ranking system (the "Seven-Point system") to assign a risk level to trees inspected by park officials. *Id.* at 488.

The Ninth Circuit held that park officials "had substantial discretion in choosing *whether* to adopt the Seven-Point system instead of some other method for evaluating

trees," but the implementation of the system was not discretionary. *Id.* at 488–89. "Once they undertook to inspect trees in the campground, [p]ark officials were required to do so in accordance with their established policies." *Id.* at 488. Rating trees under the Seven-Point system involved technical considerations, not policy considerations. *Id.* at 489 ("Even if the Seven-Point system requires officials to make difficult choices, it still does not ask them to make *policy* choices and it does not afford them an opportunity to rate a tree based on their social, economic, or political views."). Park officials were only tasked with making decisions about the risk posed by a specific tree based on the Seven-Point system. Accordingly, the Ninth Circuit held that the discretionary function exception did not shield the Service from tort liability. *Id.* at 490.

      The Ninth Circuit reached the opposite conclusion a year later in *Lam*. 979 F.3d at 670. There, a rotting oak tree buckled and fell onto another tree that collapsed onto the plaintiff's tent at Lake Mendocino campground. *Id.* at 670. An employee of the Army Corps of Engineering, which operates the site, had inspected the oak tree in the past and "never saw any reason to believe it was dangerous." *Id.* at 671. The Ninth Circuit held the discretionary function exception applied, distinguishing *Kim* on the grounds that "nothing in the Corps' policies at Lake Mendocino even approaches the level of specificity found in [Yosemite National Park's] Directive 25 or requires or mandates abatement or mitigation of certain trees." *Id.* at 678. Lake Mendocino's policies did not specify any "requirement, checklist, or criteria for how to conduct [daily hazard inspections] or what they should cover." *Id.* at 679. The site's hazard tree removal plan required rangers to "remove dead trees, limbs, and snags before they become a public hazard," but provided

"no specific criteria for identifying dangerous trees." *Id.* These "general requirements" meant the plan's execution was left to "Corps employees' judgment and discretion." *Id.*

*Kim* and *Lam* demonstrate that where a park's management policies prescribe a specific course of action that leaves little room for an employee to make their decisions based on policy, the employee has a mandatory duty to perform that action, and the discretionary function exception does not apply.

**B.     Park employees' failure to inspect the subject tree was a discretionary choice subject to policy considerations.**

Opdahl and Saib assert the government failed to protect against the dangerous conditions of the subject tree by failing to remove it. Dkt. 22 at 3, 5. Because the Service's policies require an inspection prior to tree hazard mitigation, the complaint necessarily challenges the government's failure to inspect the subject tree. Dkt. 40-2 at 7–8; Dkt. 38 at 9.

The government contends the Park's failure to inspect and mitigate the hazard from the subject tree involves a policy judgment and thus falls under the discretionary function exception. Dkt. 38 at 8. It argues the Park's hazard tree management plan did not require the Service to inspect the subject tree. *Id.* at 10. Referring to the plan's objectives to "balance . . . mitigating hazard trees, ecosystem preservation, and cultural landscape preservation," it argues that "managing the Park's trees is susceptible the type of policy considerations entrusted to the Park Service." *Id.* at 10, 11.

Opdahl and Saib argue the discretionary function exception does not apply to implementation of the Park's hazard tree management policy. Dkt. 49 at 8 (citing *Kim*,

940 F.3d at 488–89). They concede the Service has discretion to decide "whether to inspect SR-123 for hazard trees," but argue this discretion ended once the Service "explicitly undertook to inspect, evaluate, and address hazard trees" and did "in fact determine that hazard tree abatement was necessary." *Id.* at 9.

### 1. Mount Rainier National Park's Hazard Tree Management Plan allows for discretion.

The Court agrees with the government that the Park's Hazard Tree Management Plan allows the Service the discretion to decide which trees to inspect along SR 123. The Plan sets general hazard tree inspection policies that did not impose a mandatory duty to inspect the subject tree.

The Plan's policies on tree inspection along SR 123 are "general requirements" akin to those described in *Lam* 979 F.3d at 679. Unlike in *Kim*, where the park officials undertook to "inspect trees in the campground," the Service in this case is required only to perform annual drive-by *surveys* and *photo documentation* of the trees along SR 123. 940 F.3d at 488. Individual tree evaluations only occur on a case-by-case basis, when trees are deemed potentially hazardous, based on the observations and reports of Park visitors and employees. The Plan mentions no specific criteria on how to identify potentially hazardous trees beyond conducting a "deliberate visual scan at slow vehicle speed" during drive-by surveys.[2] Dkt. 40-2 at 8. It leaves identification of potentially

---

[2] Opdahl and Saib do not allege, and there is no evidence before the Court, that the Service or WSDOT failed to perform annual drive-by surveys along SR 123. Any such evidence would nonetheless be irrelevant to the Court's determination that the Plan leaves the inspection of trees along SR 123 to Park employees' discretion.

hazardous trees to the judgment and discretion of experienced evaluators who can "recognize anatomical features associated with failures" from drive-by surveys and photo documentation. Dkt. 40-3 at 10. *See Lam*, 979 F.3d at 679 (Lake Mendocino's management plan contained "no specific mandate for what constitutes a weak, damaged, diseased, or undesirable tree," leaving the identification of dangerous trees to employees' discretion). Although the WSDOT work order states "All Hazard trees . . . are to be identified" along SR 123, it provides no further clarification on *how* WSDOT and Service employees will identify hazard trees. Dkt. 50-1 at 3. In fact, it defers to the Park's Hazard Tree Management Plan on assessing hazard tree conditions.

The Plan's periodic survey requirements along SR 123 stand in contrast to the monitoring and complete surveys required in more developed areas of the Park, where employees must thoroughly inspect and rate suspected defective trees in the area using the eight-point scale. Dkt. 40-3 at 12–13.

The Park's policies do not mandate individual inspections of all the trees along SR 123, but instead leave that decision to Park employees. The Service's decision not to inspect the subject tree was discretionary, based on the employees' judgment and discretion.

**2. The Service's decision not to inspect the subject tree is susceptible to policy analysis.**

Both the Service's overarching management policies and the Park's Hazard Tree Management Plan contemplate various policy considerations in maintaining safe and meaningful opportunities to enjoy the Park's natural resources. Dkts. 40-1, 40-3. The

Service's management policies provide expressly that while safety is a priority, the Service will take "discretionary management activities . . . only to the extent that they will not impair park resources and values." Dkt. 40-1 at 7. The Hazard Tree Management Plan similarly declares that the Park strives to "maximize the benefit/cost ratio of the hazard tree program, both in terms of property damage prevented and money expended for inspection and implementation" and "maintain a balance between mitigating hazardous trees, ecosystem preservation, and cultural landscape preservation." Dkt. 40-3 at 8. Trees along roads are exempt from complete surveys because of the "extensive personnel and time requirements and low potential for striking a target." *Id.* at 15.

Whether to inspect for potentially hazardous trees along SR 123 is plainly subject to policy factors such as safety, budget, staffing constraints, and ecosystem and landscape preservation. *See Lam*, 979 F.3d at 681. Opdahl and Saib provide no evidence to defeat the *Gaubert* presumption that the Service's decision not to inspect the subject tree was based on these policy considerations.

The Court acknowledges the tragedy and hardship that arose from this unfortunate incident. However, the Service's decision not to inspect and remove the subject tree along the side of SR 123 in Mount Rainier National Park was a discretionary choice subject to policy considerations. The discretionary function exception applies, and the government's FTCA waiver of sovereign immunity does not.

The government's motion for summary judgment, Dkt. 38, is **GRANTED**. The government's motion to exclude the plaintiffs' expert opinions, Dkt. 43, is **DENIED** as moot.

The Clerk shall enter a **JUDGMENT** and close the case.

**IT IS SO ORDERED**.

Dated this 29th day of May, 2025.

BENJAMIN H. SETTLE
United States District Judge